The Judges of the U.S. Court of Appeals Fair ye, fair ye. The United States Court of Appeals for the Sixth Circuit is now in session. All persons having business before this honorable court, draw near, give attention, and you shall be heard. God save the United States and this honorable court. Please be seated. Good morning. Welcome to the Court of Appeals for the Sixth Circuit. Before we begin, we do want to assure you that we are prepared for your case this morning. We have read your briefs. Because we are prepared, we would prefer it if you'd please argue the most critical issues in the case. We will assume that for arguments that are not made today that you rely upon the arguments contained in your briefs. Finally, if you're counsel for the appellant and wish to reserve some time for rebuttal, so indicate to me. We have granted extended argument on this case because of the multiple plaintiffs and multiple claims. 25 minutes per side. And with that, you may call the first case. Case 23-5027 and 5075, Janae Hayes et al. versus Metropolitan Government of Nashville and Davidson County, Tennessee et al. Good morning, Your Honor. Ann Steiner of the Nashville, Tennessee Bar. I'm here for all five plaintiffs today. Skipping to what we consider to be the first most important argument, probably the one that affects most of the plaintiffs, and that's that most of the claims were dismissed because of the reason, the nondiscriminatory reason given by Metro for the elimination of the positions. And that was a budgetary crisis that occurred in the spring of 2020 right when COVID hit. We think that for summary judgment purposes, we had set forth material issues of fact, in fact, many material issues of fact that should have been taken in our favor that should have precluded summary judgment. For instance, with regard to the budget, the district court found that the defendant had been asked to cut its budget by $100 million and that the COVID-19 pandemic caused significant upheaval, stress, and chaos at every level of city government. Your Honor, we do not believe that there was sufficient facts to show that, and especially from a financial standpoint, it certainly did not cause any chaos. In fact, the facts that we showed that we set forth that should be accepted as true for summary judgment show quite the opposite. Defendant claims they had to reduce the budget by $100 million. They did not do that. The budget— I mean, they were asked—she was asked to do that, right, Ms. Battle, Dr. Battle? Dr. Battle testified to that. There's not a single document that's ever been produced where she was actually asked to do that. In terms of whether or not it happened, no, Your Honor, it did not. No, I know it didn't happen, but, I mean, it doesn't seem to be a particularly disputed point that she's asked to reduce the budget. This other stuff's kind of a gloss, and I get your point about it. I don't know if it's really here nor there, but, you know, she's asked to cut the budget. I mean, do you really doubt that? Yes, Your Honor, I actually do in this case because we had all kinds of other information in this about a retaliatory atmosphere. What I don't understand is why do you want to die on that hill? In other words— Or fight, right? Fight. Fight. Well, it seems to me you could just—why don't you just poke through? I mean, your brief does this, and I struggled with that part of it because it seemed to me you have some strong claims, and they get lost in this budget fight, and I think that's what happened in my review of the district record, district court's record. Well, Your Honor, if you even set the whole budget issue— Why don't you just go by claim by claim? That's—I mean, look, we have to pull out of your brief to get claim by claim for your plaintiffs, but, you know, we're addressing them as individuals, and you're saying, okay, she didn't have a legitimate reason. That's your theory, right? Yes. And so you asked them. Let's say she had a legitimate reason. My argument, if I were you, would be even if she had—even if they asked for the budget cuts, she can't ask all the people that disagree with her, that voice things, that go through these things. Like, you could point out, like, you did with Bailey and, you know, Hayes and what they were doing, what their individual circumstances are that justified the claims they brought. Well, Your Honor, then I would like to talk first, then, about Dr. Bailey. That might be advisable. He was the principal in the system who lost his job, and the court found that his cause of— While you're on him, instead of telling us the facts, can I ask about his—what accounts for ordinary job duties? In other words, how many times—it seems to me, is there some case you have that says if he testifies three times or six times, it becomes his ordinary job duties? How do we figure that out? You do not, Your Honor. I do not think it's defined by the Supreme Court in the Lane v. Franks, except in terms of Clarence Thomas' concurring opinion where he said—where he is talking about what does constitute ordinary testimony, such as a police officer who's in court all the time testifying about his investigations, a crime technician. That is what is meant by ordinary. Well, I saw that. I saw you cite Justice Thomas' concurrence, but the way I read that is, okay, there are some positions where it's a normal thing, right? And then there could be other positions where it's part of your job duties, but you don't testify that frequently. Well, Your Honor— Would you agree it's part of a police chief's job duties? His principal's job duties to testify? Or his ordinary job duties to testify when necessary. No, Your Honor, I do not. And the reason why is because under the statutory framework of the Tenure Act in Tennessee that he was testifying under, it doesn't say you have to have the principal to testify. And oftentimes when a— Okay, so now you're getting at it. Does the statutory framework have to require it? Well, his job description doesn't require it, and the statutory requirements for a principal in the state of Tennessee doesn't require it. So the only thing left may be a statute— What the district court said, basically, it's an actual extrapolation. No, Your Honor, we disagree with that. We think that that would pull in too many individuals to be not protected by the First Amendment when in the ordinary course of their job duties they don't testify. And for Dr. Bailey, he doesn't testify in the ordinary course of his job duties. One other time in eight years is not ordinary. And that's the problem here. And even if a worker does appeal the termination, there's many a level of employee who could come in and testify that justifies why he was terminated. The ultimate responsibility falls with the director of schools. But even with the director of schools, even with the director of schools, he doesn't have to testify in these cases. So it's kind of a—many individuals should not be barred from First Amendment protection because of this code section. How about making the recommendation of firing Val's brother? Is that part of his job duties to make a recommendation? I know he's not responsible for termination of the coach, but is it part of his duties to make a recommendation as to what to do with it? Yes, Your Honor. He's the one that makes the recommendation. But many times a recommendation does not mean you're the person who's walking into court to testify. Okay. Because despite the recommendation, you still have to have the underlying facts. And so it's really up in the air who the one ultimately is who's responsible for testifying. Well, I mean, if he's testifying as to a part of his job duties as opposed to facts, I thought the argument was he's just a fact witness. But if he's actually there testifying as to his recommendation that was part of his job, I think maybe testifying is an extension of it. Your Honor, he did testify as to what occurred to—he was there— That's a little different. I mean, that's—okay, testifying as to facts is one thing, but testifying as to what I did, part of my job duties, which was make a recommendation, and why I made the recommendation, it seems a little bit more job-related to me. Well, Your Honor, the actual investigations that occurred in this case occurred in HBAR and occurred in the auditing department. It was not conducted by Dr. Bailey. He did have to make the recommendation, but he did not have to—he was subpoenaed to testify, and he had facts, too, as to what occurred because he actually had a serious fact. He was contacted and he spoke with Coach Battle the day of the incident, and he was told by Coach Battle that he indeed hit a parent as the parent was being held down. That's an important fact that was necessary for the hearing. Can we move to someone else? Oh, yes, Your Honor, that would be fabulous. On Hayes, can we talk about not her First Amendment claim—or, well, her First Amendment claim, but that she was denied the RPS position? And can you give me the best evidence that she wasn't given the RPS position because of her complaints? Yes, Your Honor. She had—she was—okay, she was told by Mr. Hall that she had the position. I read his deposition testimony to say—so you're not saying he said that in his deposition? No. He wanted to have her hired, right? He wanted to have her hired is what I thought. Yes, yes, but it had to be approved by HR, okay? And so it was taken to HR for approval. Right, and then you point to Angela Johnson's declaration that she talked to Spencer, but Spencer didn't—as I read the declaration, and you should tell me where I'm wrong, if you look at, like, paragraphs 8 through 10, where she talks about what Spencer said, she didn't say Spencer turned it down, I think Spencer had to go talk to another woman—I can't remember her last name, but—and then it was ultimately turned down. Yes, Your Honor, that's what we had in terms of the testimony. And so all inferences are to be taken in our favor on summary judgment. But I thought the reason it was turned down is because the position, it was cost too much. We have facts and we have inferences that show that's not. When you take it to the HR director, and the HR director, which you never see this in many a case, throws her hands up, rolls her eyes back in her head, and said, why would they want to hire her? She has a lawsuit against the district. That never happens. The inference is that within probably the day that happened, within the next day, my client was turned down. The inference that should be taken in our favor is that HR, who was responsible for approving that decision, turned it down because she had a lawsuit against the district. If you look at the cases on this about whether or not the statement of Spencer should be counted against her, four factors you look at. Was it made by a decision-maker, an agent, or an agent within the scope of their employment? Absolutely. If you take the inferences in our favor, Spencer was the decision-maker. Were the statements related to the decision-making process? Why would you want to hire her? She has a lawsuit against the district. Absolutely. The third factor, were they just vague, ambiguous, or isolated remarks? Well, if Ms. Johnson understood exactly what those remarks said, and those remarks said to Ms. Johnson, Ms. Spencer does not want to hire Janae Hayes into this position. They're not isolated. It's not ambiguous. And once again, you need to take all facts, all inferences in our favor because we're the non-moving party here. And then the third one, was it proximate in time to the act? Absolutely, within days. Within days. So, for the RPS position, Ms. Hayes should have been granted, summary judgment should have been denied on that issue, Your Honor. Okay, I thought their position was that their budget just did not allow them to hire her within the salary range. And you say you dispute that? And you disputed how? What evidence do you have to dispute that? We're showing that we had other facts that showed that that may not be the true reason. Well, the budget is not the budget? Is that what you're saying? No, we're saying that if someone says the budget caused something, but you have a supervisor on the other hand saying, in HR, we're not going to hire you because you got a lawsuit against that. Okay, so you don't dispute that they don't have the money in the budget to hire her? For that, we did not, well, to begin with, I believe he indicated that there was money in the budget, or he had to check about the money in the budget, but we think that the statements of Spencer alone. Well, I know, even if they didn't want to hire her, if they didn't have the money to hire her, what is the real reason she's not hired? Because there's just not money. I mean, you know, you can have bad motives, but if bad motives don't cause it, you know, you don't go forward. You have to have causation, and if the cause for her not to be hired for the position is that the budget didn't allow it, irrespective that they've got bad motives, she loses. Your Honor, when it went... If you haven't disputed the budget, that's all. When it went to Ms. Spencer for approval, first thing she said was... I know that. ...related to the... I know you said that. And we think that... He's saying none of it matters if they don't have the money anyway, so what would your response to that be? Well, Your Honor, my response to that would be sometimes you can have two... Try it. Two different causes, two different causes. It's like in the Comstock case, Bostick case. Wait, now don't completely concede the hill. I'm sorry, Your Honor. What you did below is you argued, and now you seem to be maybe... Are you abandoning your argument that because you started it and you weren't... They didn't have real budgetary concerns. Johnson, right, thought they had the money. And Spencer's proper reason was the money. Our Dodd case says, as long as you dispute it, that a jury could doubt it, that the budget concerns were driving this. And so what Judge... Let me explain to you what Judge Griffin's saying, because I think you're missing the point. Judge Griffin's saying, look, if they never had the money in the first place, it doesn't matter what she said. But what you said below is they did have the money, and this was basically pre-taxed. Right? They were using the budget to avoid hiring her because she filed the lawsuit. That's one argument. That's... But you're not making that argument right now. What you're saying is it doesn't matter if they didn't have the money. They can't say bad things, and that's not what the law says. Your Honor, in terms of the budget and whether or not the school system did have enough money in the budget, we put on an ample amount of disputed issues of fact that the budget did not cause any of this, that the budget, they actually got $20 million more. Well, that was after the fact. I mean, my recollection is, first of all, they're told they've got to cut the budget by $100 million, okay? And whether that actually takes place, that is the framework they're operating under that we have to cut the budget. And the fact that down the road they didn't do it because somehow they get more money doesn't change the fact that at the time they're instructed we've got to cut the budget. And so I... Your Honor, Ms. Hayes, when she applied for the RPS position, it was in November of 2020. Okay. And by that point, the budgets had already been adopted. And so they already knew... Let me tell you what I'm going to ask the other side.  Maybe this will help you. Spencer didn't say they don't have the money. She said it would affect the equity in salaries. That's right out of her testimony. It would cause an impact on the budget. But she didn't, she never said we don't have the money in her deposition testimony that I saw. Now, maybe the district would point me to something that I haven't seen. But... So, I don't understand. Why isn't your response that isn't a legitimate concern? Because when she made the decision, she said it would affect the equity in salaries, not that we don't have the money in the budget. Yes, Your Honor. You're exactly correct. Thank you. Any more questions, Your Honor, about Ms. Hayes? Or do you want me to move on to... Why don't you try Loeffler? Loeffler. Loeffler is Ken... She had a... One of her claims survived. And the claim that survived was the elimination, whether or not she was going to get rehired back into her old position. Literally, Loeffler was told that she, her position was being eliminated. It never was. The executive director position stayed. Well, they kind of reshuffled it, right? I mean, they went from 13 to 15 and scrambled it, so maybe it was all new. No, Your Honor, it wasn't really quite reshuffled. Most everyone got their jobs back except... 13 got their jobs back except for two who were retiring anyways, one who we don't know about, and Lily Loeffler. And the only, only questioning of her job performance at any point in time by the director of schools was that can she be loyal to the system because of a lawsuit that her relative had just several months before that resolved. So hadn't she filed that two years before? Filed two years before and continued in the ranks for two years. And it was set for trial in January of 2020 and it settled in 2020. So within... And everyone was subpoenaed to come in to testify in January of 2020. So within three months of that matter resolving and Dr. Battle becoming director of schools and Dr. Battle questioning her supervisor about whether or not she can be loyal to the system and he told her she's a stellar employee. Yes, she can. She loses her job. And she was one of the best executive directors there. And it was... How do you know loyalty is tied to the lawsuit? Because of the statements that have been made in this case. Both of the director of schools questioning loyalty. Words used. Can you be loyal? Can she be loyal? We have the statement of the human resources director who was the director in the year before all this who said that besides that there was a retaliatory atmosphere at metro schools that Dr. Battle would question the loyalty of people who made claims such as sexual harassment. But she didn't make a claim. It was her cousin. It was her cousin. And that's protected under associational protection. No, I understand that. But why? Under those cases you've got to tie the loyalty here to the lawsuit there. And that's my question is how do you tie Dr. Battle's statement could she be loyal to the lawsuit? Because the questions about loyalty were in terms of can she be loyal because of Vanessa, because of Dr. Cressida's lawsuit. Can she say that because of Vanessa? I think I'm positive. Yes, Your Honor. Where are the records? Your Honor, I think it is in the – Your Honor, I'll find it. Yes, I will, Your Honor. But, yes, it was. It was in the record. Because that was the whole gist of this. She couldn't be loyal to the system because of her relative's lawsuit. And I'm positive that it is in Dr. Cathy's declaration. I just don't know the paragraph number. Don't worry about that. We can find all that. Okay. Any other specifics, Your Honor? Okay. I guess not. You'll have your three minutes rebuttal, Ms. Steiner. Thank you, Your Honor. Let's hear from the appellees. Good morning. Good morning. May it please the Court, my name is Benjamin Puckett. I represent the Metropolitan Government of Nashville and Davidson County, Tennessee. Here the trial court correctly granted summary judgment on 24 distinct claims, 11 of which have been challenged here. For the following reasons, this court should affirm the decision of the lower court in its entirety. In March of 2020, the city of Nashville and the world around it was on the brink of tragic and tumultuous times. The city had just been hit with a devastating tornado. And the tragic realities of the COVID pandemic were becoming more and more apparent. It was in that season that the school board assigned or appointed Dr. Adrian Bow as the permanent director of schools. Can I, I mean, we kind of know the facts. Can I pick up where we left off?  So if we're looking at her prima facie case, right, it's a minimal showing, our court says. You just need some evidence and let's talk about causation, some evidence of causation. And I mean, why isn't that standard met when the director of schools, Dr. Battle, repeatedly says to Leffler's supervisor, you know, can she be loyal? Well, I mean, I don't see anybody else's loyalty being questioned anywhere here, right? There's nobody else whose loyalty is brought into question. So, you know, some evidence, minimal showing, prima facie case. We're not, you know, this is not like a big lift. So how is that not satisfying? Well, I would suggest that first, in light of the sweeping changes, the executive director position was shuffled as you. Let's say you're right about that. Okay. I mean, okay, you know, yet you have the director of schools questioning the loyalty of a specific individual who said she was retaliated against because of her lawsuit that had been wound up three months before. I mean, why isn't that enough for this minimal showing? Sure, and I think Judge DeParth touched on it, which is that the retaliatory animus in this case has to be directed at the individual who engaged in the protected conduct. Right, and so she asked about Leffler's loyalty in particular. It sounds like it's directed at her. Well, I would suggest that that's right. If there is any sort of negative feeling here, it's directed towards Leffler. In an associational retaliation case, it needs to be directed at the individual who engaged in the protected conduct, which is a third party. That is associational retaliation. I'm going to get back at. I don't understand that from a legal standpoint. I mean, Leffler has to show, she has to come forward with some evidence that the district is retaliating against her, not against her cousin, her for bringing the lawsuit, right? Or is it the cousin that brought the lawsuit? The cousin brought the lawsuit. I'm sorry. That's okay. All right, but, right, but I mean, the case has recognized this associational retaliation. Right, and the retaliatory animus in this case would need to be directed at Ms. Garcia, the individual who brought the lawsuit. And so I'm going to use Ms. Leffler as a tool to retaliate against Ms. Garcia. And that's not in the evidence. And suggesting that there may be a loyalty issue, I don't think bridges that gap. And then beyond that, Your Honor, I think there still is causation issues. If I may just, and then I'll let you talk what you want to talk about. So, I mean, is it your position, then, that if the director of the schools questions the loyalty of Leffler because of her cousin's lawsuit, and she thinks that, Dr. Bettle thinks that Leffler now is unreliable, that is not enough to show causation that she's being retaliated against because of that lawsuit? I would suggest that's not enough to show retaliatory animus. Okay. All right. That's a twist I haven't figured out. Why not? Sure. Why not? Because I think in this case, there's nothing on the record that would suggest that Dr. Battle had any animus toward Ms. Garcia. Dr. Battle is able to make hard choices. Garcia is the cousin, right? That's correct. Okay. This is going through the Thompson versus the Stainless Steel case that I was reversed by the Supreme Court on. And that was actually my argument that I got reversed on, is that there was no retaliation against the plaintiff there for the cousin's lawsuit. And it was just too tenuous to say that I'm trying to retaliate. I'm retaliating because I'm trying to get the cousin through you. And I said the causation there just isn't there. There's no connection. But the Supreme Court said, no, that's enough. I mean, aren't you arguing against the Thompson case? I would suggest that I'm not, Your Honor. And I think the discretion that Dr. Battle has in selecting these individuals is important here. She has the discretion to choose individuals who fit and work with her personality, who have not. Right. Okay. We agree with that. Okay. But they can show that's pretext. Let me make the argument that your friends on the other side didn't make for Loeffler. Sure. You give me the response. Lawsuit settles a few months before. She immediately is questioning Loeffler's loyalty. Where I think the district court made a mistake, I'm not saying Loeffler wins. Where I think the district court made a mistake is they said, oh, the plaintiffs have to show pretext for the entire reorganization. No, the plaintiffs have to show pretext that she was included in the reorganization because, not for a proper reason, but because Loeffler questioned her loyalty because of her cousin Sue. So why isn't that enough to satisfy what Judge Griffin's asking? Sure. Thank you. And I was headed in that direction, Your Honor. The decisions regarding the elimination of the position, which is the adverse employment action that's alleged here, they weren't individual decisions. It wasn't as if Dr. Battle went through and said, I'm going to eliminate this executive director position and that executive director position. The decision was made across the board. But she doesn't eliminate every position, I think, is the problem you have with that argument. I would say that the record says that she did. I think this is just sort of ultimately semantics because some people, like 11 of 13, do get rehired then. So why isn't she rehired? She's not rehired, they say, because of retaliation because her cousin just got a settlement and had been fighting with them for two years. So, yes, our argument, and I think the district court agreed, was that there was an entire process. It wasn't unilateral and it wasn't sort of instantaneous. So I'm going to fire everybody but then rehire everybody except for the people I don't like. That's not how it went. So the position was eliminated. There was a new and broader executive director position that was created. And then there were panel interviews. And everyone had to reapply for their job. I get it. And 11 of 13 get rehired. That's right. Right. So we're kind of back to, I don't know, maybe I'm just fixated on it. And this is my last question. I'll leave you be on all this.  So we're viewing the evidence in the light most favorable to the plaintiffs here. They didn't get a jury trial. Why couldn't we infer from the repeated questioning about Loeffler's loyalty that there was retaliatory animus toward the cousin? I mean, is that just a coincidence? So, Your Honor, I think this comes down to a business decision that was made by Dr. Battle. We get that. We totally get that. We keep coming back. Sure. Yeah. I mean, I'm asking you this because, you know, sometimes the judge says, basically, here's my problem with your argument. Tell me why I'm wrong. That's a nice thing. I always thought, really, I was like, thank you, Your Honor. So I'm kind of fixated on this point. And I understand your point about the business arrangement. I just think that I'm still fixated on this point. But COVID, Judge Catlett just said this is an opinion. It can't, it doesn't wash away the Constitution. Absolutely. Did I say that? In a religious realm. Maybe I did. That's what I take credit for. The point being is, I thought the reason, and you should correct me, you all know the record better than me. I thought the reason she was questioning her loyalty is she asked, can she separate the work from the cousin's lawsuit? Correct. That's right. That is right, right? And so then, viewing that in a like most favorable, couldn't, they doubt it. And the settlement just happened months before. Do you agree that the time we use for causation is from the settlement to the statements, not from the filing of the lawsuit to the statements? Yes, Your Honor. Okay. Yes. Why not, you know, how about all the fighting that precedes the settlement, you know, which is like going right up until the settlement. Yeah. And if I may address that, all of the fighting was about a different director of schools and their tenure. So, and that may be where we have the most difficulty with this. If there's no suggestion that Dr. Battle would have any animus toward Ms. Vanessa Garcia over her lawsuit that didn't involve Dr. Battle's tenure. And Dr. Battle wasn't in charge. She wasn't involved in that lawsuit at all. It didn't have any effect on her or her administration. It feels like jury arguments, you know. I mean, it gets to a point, it's like, why are we trying to figure this out? Well, I think they. All this back and forth and this and that and, you know. I think they have to show some pretext, Your Honor. And I think that without anything on the record that would suggest that Dr. Battle had any animus toward Vanessa Garcia, I just don't think it's there. I think the statement saying, you know, is this, you know, is this going to cause Ms. Leffler, you know, to have loyalty problems? Is she going to sort of hold this against the school district? I don't think that in and of itself is a statement that, you know, I have some animus here against this lady. And, you know, boy, I wonder if I'm going to have to hold this against her. I think that's a different statement. I will suggest Dr. Battle has denied making that statement. Of course, that's a, you know, we're suggesting is not a material fact. So whether it's a dispute or not. Can I ask, can we move on? Absolutely.  Thank you. On the RPS position for Hays, is there anything saying, A, they didn't have the money versus the quote I read from Spencer where she says it's a matter of salary equity? So I would suggest Ms. Spencer didn't have the knowledge of the departmental budget. That came from Mr. Anthony Hall. He was the relevant decision maker in this case, and he knew his department's budget. Mr. Anthony Hall, he said, I submitted it in his deposition, right? Towards the end of his deposition, he says, I submit this. I'll read you the quote I'm talking about. He said it's an HR call during his deposition, and then he said, I didn't put any dollar amounts. That's an HR call. Right. Well, it's an HR call in that they're the administrative function of the school. They sort of hold all of the numbers. And so Ms. Spencer wasn't making a decision about Mr. Hall's budget. She's literally referencing a spreadsheet, if you will. Where does he say in his deposition, I didn't hire her because of budget? I can grab that line number for you. It may take me a second. It's in his deposition that, one, he didn't have the authority in the budget to hire her for that amount. The amount is too much. The amount is too much. The amount of her salary is too much. But then he said, I can submit it to HR. Well, no, I'm sorry. He didn't know what her salary was going to be before he submitted it to HR. He says, I interviewed Ms. Hayes, I liked her, and I wanted to hire her. And so I say, hey, I want to hire Ms. Hayes, and he puts it into HR's hands. Their only role there is administrative. They're not making any decision about whether or not to hire her. They just say, okay, Mr. Hall, if you want to hire Ms. Hayes, her salary is going to be $80,000-plus. And they send that information back to Mr. Hall. At that point, Mr. Hall says, oh, gosh. One, we don't have the money. One, that's going to be more than I make. It's certainly going to be out of line with everybody else in my department. And two, I just don't have the authority for that in my budget. Okay. That was the answer. How about Hayes' First Amendment retaliation claim? Can we talk about that? You mean Ms. Janae Hayes' First Amendment retaliation claim? Yeah. Sure. Tell me why that shouldn't be reversed. Why it should be reversed? Yeah, the summary judgment. Your Honor, it's our position that this court should affirm all of the Yeah, he's saying why. I'm sorry. All right. Tell me, yeah, I'm sorry. Tell me why it should be affirmed. Okay. Yes. Thank you, Your Honor. So Ms. Hayes, her First Amendment retaliation case runs into causation issues. And I believe Judge Griffin mentioned this, that in the same light as all the other appellants here, these decisions were made in a sort of broad arena. So budget decisions were made across the board, and positions were eliminated, which happened to include Ms. Janae Hayes' position. So there's no connection, then, between her protected conduct and her alleged adverse employment action. Because, again, these decisions weren't made in a vacuum. They were made sort of across the board in a sweeping remuneration. So you're saying they don't have evidence of pretext? That's correct, Your Honor. But yet the outgoing HR director says this was moving toward a retaliatory atmosphere under Dr. Battle. So I think what that testimony was is that we have a retaliatory atmosphere under the previous director, which was Sean Joseph. And so I don't think, again, that's a different administration. And it's one of the reasons why Dr. Battle made these difficult decisions. She needed to reset the culture, and she said that. She said, you know, we've got budget issues, we want to funnel opportunity to the school system, but we also need to revitalize the culture. A couple months after the slavery comment, or the thing with her son, and a couple months after the lawsuit, they eliminate her position. I mean, they could have eliminated somebody else's position, but they chose her position. And so why isn't that the issue of fact, whether it's protection or not? Well, Your Honor, again, I would suggest that the district court found in its Petra's argument that these decisions weren't made in a vacuum. She wasn't isolated. No, but they didn't eliminate all the positions, right? But they eliminated so many, a number of them. And of that number, they chose Hayes's position to be one of those, to be eliminated. Well, is the reason they chose her position over somebody else's that was allowed to continue because of retaliation? I mean, isn't that a factual issue? No, I think, Your Honor, there were, the four associate superintendent positions were eliminated. There were five other executive-level roles. And I understand that you're saying that that involves individual decisions. They have to, you know, pare down the budget by a certain amount. So they've got to cut so many positions. But it's not given that Hayes's position has to be one of those. That's all. And did they pick her position because of retaliation? I mean, that's the issue. Yeah, I think that is the issue. And I don't think there's anything on the record that would show or suggest that, Your Honor. Well, how about her complaint about the slave, acting like a slave comment? I mean, her complaint about that. Well, okay. And it happens four days after the video. They take over her son. Right. Metro had arguments whether or not that that was actually protected conduct, Your Honor. And I think, you know, with regard to the Well, her lawsuit is protected. That's correct, yes. And her speech about including her son in a slavery lesson is protected. Yes, that's correct, Your Honor. Okay. So, well, I think the issue here, then, is that the level of sort of care and consideration that went into all of these decisions suggests that it cuts against any pretext argument. But that's a jury question. You can argue that to a jury. But let's go back to Judge Keffridge's question. You're asking us to weigh the budget and COVID versus the Constitution, in essence. And really, if that's protected, the jury can decide if it was connected. It's our position, Your Honor, that that's just too tenuous of a connection. There's just not enough there.  Not the temporal proximity, but just any evidence of any sort of attempt to retaliate against her. Well, and she can use Spencer's statement. But Ms. Spencer isn't a decision maker. No, I understand that. But just as Judge Keffridge said, there's testimony about a retaliatory atmosphere. There's testimony specifically that people were irritated by her lawsuit. Is she the one who rolls her eyes? Yeah. Ms. Spencer rolls her eyes? Yeah. I mean, isn't that evidence of retaliatory atmosphere generally and then specifically towards Ms. Hayes? Well, I would classify Ms. Spencer's comments as textbook stray remarks, Your Honor. I don't think that in that— How so? It's like a direct strike on potential motive, isn't it? Sure, but it's— Why wouldn't we hire her? She just, you know, she has a lawsuit against us. Sure, but it's an individual who has no decision-making power, no authority over whether or not she's hired or whether or not those positions were eliminated. Just making a sort of offhand remark about, well, why don't we do something like this? It's not that it's about some adjacent subject.  It's about—it's somebody who doesn't have authority. Right. It's an opinion that doesn't matter. It's an opinion that doesn't carry any weight in any of those decisions. It's water-cooler stuff among the, you know, sort of— Exactly, Your Honor. Yeah. Okay. The non-decision-makers. Exactly, Your Honor. I see I'm running short on time. Would the Court like me to address Dr. Bailey's First Amendment issue? Sure. Okay. So— Certainly. That's a hard fact for you. No, I don't think it is, Your Honor. Because if it's part of his job, you don't have to use legal process to compel him, right? Sure. It's like either you show up or you're—it's great. I mean, it's like, you know, I have compulsory process because if you don't do this, you're fired, you know? Well, I don't think there's anything— But they didn't do that. They actually got a subpoena, which is a pretty strong indicator. They didn't otherwise have a means of compelling his testimony, it would seem. Well— So having said that, you know, that's what you're facing. Yeah, I think those are two separate issues. So I'd like to address Judge Kethledge first. I think the subpoena is a sort of nature of the formality of the hearing, but I would remind the Court that this was not— But, I mean, isn't that weighing evidence again? No. It's like, no, you know, it's really this, and I don't know. You normally don't subpoena your own employees, your own witnesses. I mean, you'll subpoena third-party witnesses or adverse witnesses, but usually your own people you don't subpoena. Well, and I would agree with that, but I don't think— Why would you? Well, there's—that's a great question, Your Honor. But I don't think that the fact that the subpoena exists has any effect at all on whether or not this was an ordinary job function. It's in the mix of evidence of whether it's his duties or not. It's evidence anyway. Whether it's compelling evidence, whether it's dispositive, I mean, that's a different question. Maybe I can just briefly address the facts here, and that will, I think, color this a little bit better. Okay, you know, I asked you why they subpoenaed him. You didn't answer me. Well, I said that's a good question, Your Honor, because I don't know— I know it's a good question, that's why I asked. The answer is I don't know why the subpoena was used. So you think it's gratuitous? I think it's gratuitous. Okay, so why? Well, here's— Because that's a tough argument on summary judgment, but I want to listen to what you have to say.  So this is an internal employee discipline hearing. This is not an external civil case. This is not a criminal matter. But that makes the subpoena even more— It makes the subpoena even less important. I think because— But if it's an internal employee, it's internal to the job, you don't have to ask your principal to show up at a student disciplinary hearing by subpoena. I think that's true, Your Honor, but I don't think that that is— Okay, well the Supreme Court says it's important, so let's set that aside. Go to ordinary job duties and tell us why this is part of his ordinary job duties and where we find that and what test we should employ. The test is a test of practicality. Now, the word ordinary, I think, it does not occur in the Garcetti case, and it was pulled from the Lane v. Franks case. In the Lane v. Franks case, all they were saying is we're not here addressing whether if you're subpoenaed in the ordinary sort of functions of your job— Why not Justice Thomas's concurrence where he says police officers, people that all the time are showing up in court, that's ordinary job duties? Sure, and the only thing Judge Thomas was saying is we're not here addressing whether or not that that is protected speech. I know he was saying those would be examples of ordinary job duties. I can't remember the exact quote, but he had like a series of these. Yeah, I think what Judge—the ultimate point of what Judge Thomas was saying was this case—I apologize, yes, Your Honor, you're correct. Justice Thomas was saying is that this is just a reiteration of the Garcetti case. We're not here holding anything new, and if we revert back to the language from Garcetti, that's pursuant to their official duties. That's the quote from Garcetti. There's nothing in there that says it must be an ordinary or routine— Okay, fine, that's semantics. How is this pursuant to his official duties? Okay, great, we're getting to it. This is the principal who made the recommendation that his employee, his subordinate employee, be disciplined. Then he suggests—then there's this hearing. The hearing is a right that's given to tenured teachers in these cases, and it's statutorily provided to the employee. So that's a routine function for principals. If you recommend discipline of a tenured employee, they have the right to demand a hearing like this. It's an internal hearing. It's not a hearing. It's not a fact-finding court. It's sort of outside— Did he have it taken out before his testimony? I don't know the answer to that. It's on the record whether he did or not. I believe he did. It was in front of an administrative law judge. That's correct. And importantly, the court noted, and the administrative law judge noted, that he was appearing—Principal Bailey was appearing as a representative of the MNPS system. And that was an example that was specifically given in the Lane v. Franks case that suggested that that would be pursuant to your official job functions. Well, I wonder if—I mean, I was tracking what you were saying there, but I wonder if that's—I mean, that seems like a different role than just the principal showing up to say that a particular coach or teacher in the principal's building is causing a problem. Now it's kind of beyond the usual role. I mean, what you described is like this is sort of a dog bites man story. I mean, the principal says, I've got a problem in my building. I mean, of course that's the principal's function, but now you're talking about something that's a little different. I mean, I wonder if that cuts against it. Well, if I did, then I misspoke, because I think what you just said was exactly what I was attempting to hit at, is that Principal Bailey was there simply supporting his decision, because, again, this is an internal HR matter. It's not a fact finding. We're not saying, yes, this coach committed assault. What we're saying is there was a disciplinary action brought, and are the reasons for that discipline sufficient under the statute? That was the entire purpose of the hearing. And that finds its root in Principal Bailey's role as a manager and supervisor, and it finds its root in the tenured teacher's right to have a hearing over whether or not they should be disciplined. It's an entirely internal process. Real quick, if I may, because your red light's not on. Sure, sure. Thank you. Who issued this subpoena? It's weird. This is like some intra-school thing. Subpoenas, I thought, courts issue typically, or, you know, Congress does, but forget about that. Yeah, I think the hearing officer issued, or it was issued under the authority of the hearing officer. So is there some state statutory regime that allows this sort of hearing officer to do that? Yes, sir. Okay, that's interesting. Yes, sir. All right, thank you. All right. Any further questions, Judge DeParle? No. All right. Thank you. Thank you, Your Honor. We appreciate it. Thank you for your argument. We appreciate your argument. Ms. Steiner, you have three minutes for follow-up. Yes, Your Honor. To begin with. Just on the Bailey thing, it's easy to pick up where we left off. I mean, why isn't he just there, you know, talking about a problem in his building? That would be sort of the most kind of core thing a principal might, one of them that a principal might do. Because he was subpoenaed and he took an oath before he testified at the hearing, and he testified about corruption basically in the system. And he had only done it once before. Only done it once before. Your Honor, if I could put this argument out there, too, whether he testifies in this hearing, we had a coach who beat up someone. That easily could have led to a criminal trial. He misused funds. That easily could have led to a criminal trial. Yeah, but that goes to whether it's a matter of public concern, not whether it was part of the extraordinary response bill. Public concern. But it also goes to testimony outside at some further place. And so I would just like to point out that just as a matter of public policy, you have to protect this testimony. That's not what I'm asking about. I'm asking about is it part of his, you know, just ordinary job duties or job duties. To, excuse me. You know, if a tenured person within his building is going to get the boot, he's got to go talk about it, right? I mean, that would seem ordinary. He makes the recommendation. He makes the recommendation. Well, you know, if they're going to have a hearing, presumably he'd have to go talk about it. So, like, what makes this the, I get the subpoena part, but why isn't it gratuitous when, of course, the principal's got to go explain why he thinks a teacher or coach in his building ought to be fired notwithstanding their tenured status? Well, Your Honor, I may miss the question completely, but in this case there were so many retaliatory statements made that if it was just made where he was just going to talk to someone in the building. But it's about Orton. I'm just asking about his job function. Sure. I don't want to hijack your whole rebuttal. So take one sentence and then you can move on. Sure. His job duties would have been solely just to recommend, and he doesn't have any, there's no job duty that says he actually has to investigate. He has to have to do anything else with regard to it. Maybe I don't understand your question. That's all right. Can I ask you a separate question about the RPS?  And this is Hayes. Here's what Judge Brevin keeps coming back to. In his deposition, Paul said, her salary range was outside of the parameters I had for my budget. That's page 10. Why isn't that the end of that point? Because he also testified that even though it was probably beyond what the budget allowed, he wasn't so much concerned about the salary, he was more concerned about her qualifications. And that's, I've got the record for that, too, Your Honor, if you'd like that. That's in the Hall deposition record, 191-8, page ID 5822. All right. Thank you, Ms. Steigert. Any further questions? Thank you for your argument. The case will be submitted. You may adjourn the court.